ENGINEER CO. v. HERRING–HALL–MARVIN SAFE CO.

(Supreme Court, Appellate Division, First Department.  December 20, 1912.)

1. CONTRACTS (§ 164*)—CONSTRUCTION—CONTEMPORANEOUS AGREEMENTS.

Where a contract to install a draft system in a boiler room of defendant's factory contained no time for performance, but a letter, signed by an officer of defendant and countersigned by an officer of plaintiff, provided for the giving of notice by defendant for the installation, and the letter accompanied the contract and bore the same date, the contract and letter must be construed as one contract, and, so construed, performance must be made by plaintiff on receiving notice from defendant.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 746–748; Dec. Dig. § 164.*]

2. CONTRACTS (§ 312*)—CONSTRUCTION—BREACH. OF CONTRACT.

A contract for the installation of a draft system in a boiler room in a factory on notice to install gives a right to postpone performance until the giving of notice, but does not reserve a right to abrogate the contract by refusal to give notice; and an absolute refusal is a breach of contract, and a cause of action therefor then accrues.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279½; Dec. Dig. § 312.*]

3. APPEAL AND ERROR (§ 1177*)—DISPOSITION OF CAUSE ON APPEAL—NEW TRIAL.

Where defendant in an action for breach of contract gave no evidence on the question of damages, but rested on a point of law, which the trial court sustained, and dismissed the complaint, the court on appeal, reversing the judgment, cannot finally dispose of the case, but must order a new trial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4597–4604, 4606–4610; Dec. Dig. § 1177.*]

Appeal from Trial Term, New York County.

Action for breach of contract by the Engineer Company against the Herring-Hall-Marvin Safe Company.  From a judgment of the Trial Term (76 Misc. Rep. 369, 134 N. Y. Supp. 810), dismissing the complaint, plaintiff appeals.  Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

James W. Monk, of New York City (Nathan D. Stern, of New York City, of counsel), for appellant.

Shearman & Sterling, of New York City (Carl A. Mead, of New York City, of counsel, and Frederick W. Jackson, of New York City, on the brief), for respondent.

CLARKE, J.  After a considerable correspondence and negotiation between the secretary of the plaintiff company and the presi-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

dent of the defendant company, a written contract was entered into between said companies providing for the installation of certain economical blowers, to be furnished by the plaintiff in the boiler room of the defendant's factory for the sum of $3,000. Every element of an enforceable contract was contained therein, but no time for the performance of the contract was therein stipulated.

[1] Accompanying said contract and bearing the same date was a letter by the president of the defendant, as follows:

"I inclose herewith signed contract for the installation of your balanced draft system in our Hamilton, Ohio, power plant, specified in your proposal of recent date; this to take care of our capacity of 900 H. P. You agree to effect a saving of 15% in our present cost of fuel, and to increase the capacity of our boilers 25%. Purchase price, $3,000. I am signing this contract, however, with the distinct understanding, as provided in our conversation with your secretary, Mr. R. E. Fox, Jr., that this work is not to be started in any way, shape, or manner until you are directed so to do by us. This means that you are to incur no obligation in the way of preparation of materials for the installation until such time as I advise you. We are not prepared at the present time to have your system installed, and will not be until I give you further notice. * * * If the contract signed under these conditions is satisfactory to you, will you kindly note same by approving one of the copies attached and mailing it to me."

This was countersigned by the secretary of the plaintiff:

"O. K.  R. E. Fox, Jr.  May 1, 1908."

The letter must be read with the contract. Without the letter, there being no time for performance stipulated in the contract, it would have been interpreted as requiring performance within a reasonable time. With the letter, it must be interpreted as providing for performance upon direction by the defendant.

[2] Thereafter a number of attempts were made by the plaintiff, both written and by interviews, to procure a direction to proceed with the work. In none of the letters of the defendant is any repudiation of the contract, but a mere postponement from time to time, for one reason and another, of performance; as, for instance, the defendant wrote on December 3, 1908:

"In replying to your letter of December 2d, raising the inquiry as to when we shall be in position to put in the balanced draft system, would say that action along this line can hardly be taken before the early part of next year. As you can well realize, business conditions are such as not to warrant heavy expenditures upon the factory plant. I, however, am deeply interested in the question of your balanced draft system, and assure you that we propose to take this up soon. It appears, now, as if we would be ready to talk business with you about the 1st of next February."

Matters ran along in this way for over three years. During this whole time the plaintiff continued obligated to install the system at any time upon the terms of the contract upon notice by the defendant. Finally, on the 9th of October, 1911, Mr. Fox, the secretary of the plaintiff, met Mr. Forepaugh, the president of the defendant, and Mr. Watson, the factory manager. The record shows the following, as testified to by Mr. Fox:

"And Mr. Watson proceeded to say that it was impossible to go ahead with the contract for the reason that they had no funds to make such an invest-

ment. I said: 'Mr. Watson, a short time ago, a week or ten days ago, I wrote a letter to your president, Mr. Forepaugh, outlining the fact that this contract which we have before us assumes, on your part, absolutely no expenditure of funds in any way, shape, or manner. We are prepared to finance that whole contract ourselves, and we will take in return the savings monthly until that contract is liquidated.' Well, he staggered with that for a few minutes, and then he branched off on the end of it: 'Well, at some future time we are liable to make some changes in the boiler room, make some changes in the layout or arrangement of the boilers, or put in some more boilers.' 'Well,' I said, 'Mr. Watson, this installation which we propose to make won't affect your layout in any way, shape, or manner; that is, the system of balanced draft which we propose to install is a flexible outfit; it is applicable to any type or arrangement of boiler plant which they might have;' and for that reason that there was no plausible excuse at all why he should hold it up for that reason. Then he backed away from that and said: 'Well, what we need most of all out there at the factory is some economical engines; we want to get away from our old style of engines, and put in something up to date, and get a bigger saving there, and we don't want to put in the balanced draft, because it would confuse our determining the amount of saving due to the boiler plant or the new engine.' 'Well,' I said, 'Mr. Watson, that is a distinct proposition by itself; the engine room is a distinct and separate institution, and the boiler room is a separate and distinct institution, and it is clean-cut; you can determine the savings which balanced draft will make in the boiler room without any trouble whatsoever, without any confusing of the two departments in any way at all.' He started out to interject some other obstacles in the way of the installation, and before letting him go ahead sufficiently far to find out what they were, I turned to Mr. Forepaugh, and I said, 'Mr. Forepaugh, it is very plain to me that you are not sincere in this; that you have no idea of letting us go ahead with this contract.' I said, 'Have you not?' and he said, 'No.' I said, 'Well, if that is the case, without any hard feelings at all, now I am satisfied to recommend to our company that we spend a little further money on this proposition, to see what standing we have on this contract, what rights we have in this contract,' and the matter ended there."

After evidence as to the amount it would have cost plaintiff to perform the contract, plaintiff rested. Without giving any evidence, the defendant rested, and the case was submitted to the learned court. He concluded as matter of law that the said contract was not to be performed until performance was directed by the defendant, and no such direction had ever been given; that, therefore, the plaintiff had failed to prove facts sufficient to constitute a cause of action, and dismissed the complaint.

It seems to us that from April 30, 1908, the date of the signing of the contract, the plaintiff rested under the obligation of performance upon its part whenever notified to so perform by the defendant, and that, while the defendant had the right to postpone the performance of the contract under the terms of the letter accompanying and to be read as part thereof, it had no right reserved to abrogate the contract, and that all question of the reasonableness of the time in which a notice should be given is withdrawn from consideration by virtue of defendant's absolute refusal to give the notice or perform upon its part at any time. That constituted an absolute breach upon its part of the whole contract, and absolved the plaintiff from proving the performance of the condition precedent, to wit, the notice. The learned court in its opinion said that the action was prematurely brought; but, as there was an absolute breach by a re-

fusal ever to give the notice, we think upon said breach a cause of action accrued, and that the dismissal of the complaint was error.

[3] We cannot finally dispose of this case, as requested by the appellant, because the respondent upon the trial rested upon its point of law, and gave no evidence upon the question of damages.

The judgment appealed from should therefore be reversed, and a new trial ordered, with costs and disbursements to the appellant to abide the event. All concur.